# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-01378-COA

KURT MISHAEL MAGEE A/K/A KURT M.                        APPELLANT
MAGEE

v.

STATE OF MISSISSIPPI                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/16/2020 |
| TRIAL JUDGE: | HON. CLAIBORNE McDONALD |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/05/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2020-KA-01397-COA

ALLEN RAY HAYNES                                        APPELLANT

v.

STATE OF MISSISSIPPI                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/16/2020 |
| TRIAL JUDGE: | HON. CLAIBORNE McDONALD |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOE HOLLOMON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |

DISTRICT ATTORNEY:          HALDON J. KITTRELL
NATURE OF THE CASE:     CRIMINAL - FELONY
DISPOSITION:              AFFIRMED - 04/05/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Kurt Magee and Allen Haynes were indicted as co-defendants for the crimes of kidnapping, sexual battery, attempted murder, and conspiracy. Following a joint trial, Magee was found guilty of kidnapping and conspiracy and not guilty of sexual battery or attempted murder. He was sentenced to serve ten years in the custody of the Mississippi Department of Corrections (MDOC) for kidnapping, followed by a consecutive five-year sentence for conspiracy. Haynes was found guilty of kidnapping, sexual battery, and conspiracy and not guilty of attempted murder. He was sentenced to serve ten years in the custody of the MDOC's custody for kidnapping with a concurrent five-year sentence for conspiracy. Additionally, the court sentenced Haynes to serve a consecutive ten-year sentence in the MDOC for sexual battery. Both Defendants' post-trial motions were denied.

¶2. Magee and Haynes appealed their convictions separately. However, because their appeals arose out of a joint trial and many of their issues overlap, this Court consolidated their appeals on January 28, 2022. For brevity and clarity, we address their identical arguments together and their remaining arguments separately. Finding no error, we affirm Magee's and Haynes' convictions and sentences.

**FACTS**

¶3.     On August 22, 2017, T.R.[1] and his girlfriend Jessica Cochran were detained at the Marion County jail on a charge of grand larceny of an automobile.  Neither one had any money, but they both wanted to post bail.  Jessica knew about a bail bondsman named Allen Haynes, who owned Get Free Bail Bonding Agency.  According to Jessica, Haynes was known for accepting sexual favors, as well as other forms of payment, in place of cash.  Jessica contacted Haynes about obtaining a bail bond, but her attempt was unsuccessful.

¶4.     T.R. also contacted Haynes.  Haynes agreed to bail T.R. out of jail in exchange for two platinum baseball cards and an iPhone.  Magee, an employee of Get Free Bail Bonding Agency, bailed T.R. out of jail.  Magee arrived in a black Chevrolet Impala with Haynes, who was in the passenger seat drinking alcohol.

¶5.     Because T.R.'s baseball cards and iPhone were in Jessica's property at the jail, T.R. was unable to use the cards and iPhone to pay the premium for his bond.  So T.R. asked Magee and Haynes to take him to his friend Quarter Sims' house to try to get some money.  T.R. asked Sims for $1,500, but Sims did not have that much money.  Haynes told T.R. to ask Sims for two "eight balls" of cocaine instead.  T.R. went back into the house to ask Sims for cocaine, but Sims said he would not have that much cocaine until the morning.  T.R. relayed that information to Haynes, and Haynes told him to get back in the vehicle.

¶6.     When T.R. got back into the vehicle, Haynes threatened to do vulgar things to Jessica while T.R. watched.  T.R. asked several times to go back to jail, but Haynes refused.  At that point, Haynes told Magee to pull the vehicle over on the side of the road.  T.R. was sitting

---

[1] We use initials to protect the victim's identity.

behind Magee, who was in the driver's seat. Haynes pointed a chrome revolver at T.R. and ordered him to get out of the vehicle. Then Magee handcuffed T.R., and Magee and Haynes put T.R. in the trunk of the vehicle.

¶7. Magee drove them to Haynes' property in Carson, Mississippi. After Magee parked the vehicle, he and Haynes pulled T.R. out of the trunk. Haynes said, "Don't try anything stupid, or I'll kill you tonight." Magee removed T.R.'s handcuffs and told him to get in the backseat of the car. They locked T.R. inside while they went into Haynes' house to play pool and drink alcohol.

¶8. According to T.R., when Magee and Haynes returned, they both appeared to be drunk. Haynes ordered T.R. to get out of the vehicle and "talk" to the utility pole in the front yard. T.R. complied. Haynes then pulled out his chrome revolver and ordered T.R. to "kiss" the utility pole. T.R. kissed the pole. Then, Haynes told T.R. he was "fixing to f*** the pole." Then Haynes ordered him to "act like he was having sex" with the utility pole and eventually asked him to continue without his shorts and underwear.[2] T.R. complied. Magee recorded the events with his cell phone and Haynes' cell phone.[3] Afterward, Haynes told T.R. that his bond was paid in full, and Magee drafted a bonding receipt.

¶9. At that point, T.R. asked to be taken to Bassfield or his friend Sims' house. Haynes ignored T.R. and told Magee to start the engine on his nearby utility terrain vehicle (UTV). Magee got in the driver's seat of the UTV, and Haynes got in the passenger seat. They told

---

[2] At some point, T.R. put his shorts back on but not his underwear. His underwear was eventually recovered by law enforcement at Haynes' residence.

[3] These videos were admitted into evidence and played for the jury at trial.

4

T.R. to get in the back of the UTV, and he complied. Magee drove them behind Haynes' house to a log cabin by a lake.

¶10. When they arrived at the cabin, Haynes took T.R. to the porch and "handcuffed" him to a post next to a five-gallon bucket of diesel fuel. Haynes told T.R. that he needed "to start talking with God" because he was going to "pour gasoline" on T.R., "set [him] on fire," "shoot [him] the head," and "put [him] in the lake." While T.R. was handcuffed to the pole, Haynes threw diesel fuel from the bucket onto T.R.'s chest. Haynes had his revolver drawn the entire time.

¶11. Next, Haynes told T.R. to "strip again" and "bend down." Haynes then shoved a "stick" into T.R.'s rectum, which broke and remained in T.R.'s rectum.[4] Haynes received a phone call, and he and Magee left the area. Haynes told T.R. that he would be back and that T.R. was going to die. While Haynes and Magee were away, T.R. remained handcuffed to the pole. Haynes and Magee eventually returned with a third man, who was never identified. Haynes then received another phone call and said he had to leave again "to go take care of some business." Haynes then threatened T.R. that when he returned, his "son will be the one to shoot you in the head and I'm going to set you on fire and throw you in that lake." T.R. was still covered in diesel fuel.

¶12. All three men left, and T.R. used some nearby metal sunglasses to pick and unlock the handcuffs. T.R. ran barefoot[5] to a nearby highway and hid in a truck near a barn shed

---

[4] During his testimony, T.R. used the word "stick" and "sticks" interchangeably.

[5] During some point in the night, T.R. was ordered to take off his shoes.

5

until the next morning. T.R. found the key in the truck's ignition, so he cranked the truck and drove away. However, the truck eventually broke down on a nearby bridge, and T.R. exited the truck and ran. The police later confirmed they discovered a broken-down truck on the bridge T.R. identified. Two men in a vehicle saw T.R. running and pulled over to ask him what happened. T.R. asked the men to take him to the "quarters" in Bassfield, and they complied.[6] T.R. called his brother, Tyrone Steward, and Steward and his girlfriend drove to get T.R. Steward's girlfriend then took T.R. to Wesley Medical Center in Hattiesburg. At the hospital, T.R. was seen by Dr. Emily Nix, who removed sticks from his rectum.

¶13. Haynes and Magee were indicted together in a multi-count indictment for the crimes of kidnapping, sexual battery, attempted murder, and conspiracy. They had a joint trial and were represented by the same two attorneys. Before trial, the trial court discussed with the Defendants the potential conflict of using the same defense attorneys. Each defendant signed a "Waiver of Conflict of Interest," which detailed the risks involved when a lawyer represents two defendants. Further, before accepting the Defendants' waivers, the circuit court conducted a hearing on the record to ensure that the Defendants were aware of their constitutional right to effective counsel. The circuit court additionally warned the Defendants of the perils of dual representation. Ultimately, the Defendants chose to have both attorneys jointly represent them, and the circuit court accepted the Defendants' waivers and proceeded to trial.

¶14. At trial, the State presented nine witnesses: Investigator John Wayne Tolar; Dr. Emily

---

[6] According to T.R.'s testimony, the "quarters" is a local hangout near Highway 42.

Nix; Amy Winters, an employee at the Mississippi Forensics Laboratory; Special Agent Frank Riley of the Mississippi Bureau of Investigation (MBI); Anna Savrock, a forensic scientist for the MBI; Tyrone Steward (T.R.'s brother); Antoinette Griggs (Steward's girlfriend); Jessica Cochran; and T.R. Essentially, Magee and Haynes' defense was that T.R. fabricated the evening's events in order to get his grand larceny charge dismissed. In support of that theory, the defense presented one witness—Chelsea Courvelle, who was in the Marion County jail with Cochran for a few months following the incident. The witnesses' testimony, pertinent to the issues raised on appeal, will be discussed in the analysis below.

¶15. At the close of trial, the jury found Magee guilty of kidnapping and conspiracy. The jury found Haynes guilty of kidnapping, sexual battery, and conspiracy. Magee was acquitted of sexual battery, and both defendants were acquitted of attempted murder. Following the denial of their post-trial motions, both Defendants appealed.

## ANALYSIS

### I. Defendants' Representation by the Same Attorneys

¶16. Both Defendants argue that the circuit court erred in allowing the same two attorneys to jointly represent them during the trial because an actual conflict existed, which rendered their counsel ineffective. Both the United States Constitution and the Mississippi Constitution guarantee an accused the right to legal representation. "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also* Miss. Const. art. 3, § 26 ("In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . .").

7

"[T]he Sixth Amendment right to counsel encompasses a right to effective assistance from an attorney who is conflict-free." *Yarbrough v. State*, 139 So. 3d 143, 147 (¶10) (Miss. Ct. App. 2014) (quoting *McCaleb v. State*, 743 So. 2d 409, 411 (¶9) (Miss. Ct. App. 1999)).

¶17.    "Conflict-of-interest claims involving attorneys in criminal cases are a species of ineffective assistance of counsel under the Sixth Amendment." *Galloway v. State*, 298 So. 3d 966, 974 (¶43) (Miss. 2020) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984) ("Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.")). "Such claims are evaluated under one of two separate standards: the *Strickland* standard or the standard from *Cuyler* [*v. Sullivan*, 446 U.S. 335 (1980)]." *Id.* (citing *Crawford v. State*, 192 So. 3d 905, 917-18 (Miss. 2015)). The *Strickland* standard requires a showing that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 688. The *Cuyler* standard is less burdensome and presumes prejudice when a claimant shows an actual conflict of interest adversely affected his counsel's performance. *Cuyler*, 446 U.S. at 345-50.

¶18.    "When the accused is represented by an attorney with an actual conflict of interest, the accused has received ineffective assistance of counsel as a matter of law, and 'reversal is automatic irrespective of a showing of prejudice unless the accused knowingly and intelligently waived his constitutional right to conflict-free representation.'" *Kiker v. State*, 55 So. 3d 1060, 1066 (¶16) (Miss. 2011) (quoting *Armstrong v. State*, 573 So. 2d 1329, 1335 (Miss. 1990)). "Thus, the standard set out in *Strickland* . . . is inapplicable to cases when the defendant's attorney "actively represented conflicting interests." *Id.* (citing *Mickens v.*

8

*Taylor*, 535 U.S. 162, 166 (2002)). When the trial judge is aware of an actual conflict of interest, "the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant in indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel." *Littlejohn v. State*, 593 So. 2d 20, 25 (Miss. 1992). "Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego this significant constitutional protection." *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975) *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259, 263 & n.2 (1984). Moreover, "[r]ecord[ing] of the waiver colloquy between defendant and judge will also serve the government's interest by assisting in shielding any potential conviction from collateral attack, either on Sixth Amendment grounds or on a Fifth or Fourteenth Amendment 'fundamental fairness' basis." *Id*.

¶19. Here, both Defendants assert that there were actual conflicts that prejudiced each of their defenses. For example, they both claim that sharing representation negatively affected their ability to testify as well as their plea negotiations.[7] Magee additionally claims that his theory of defense—duress—conflicted with Haynes' theory of defense—that T.R. fabricated the story and he had legal authority as a bail bondsman to detain T.R.

¶20. The United States Supreme Court and the Mississippi Supreme Court have held that

_____

[7] The record reflects that these issues were specifically addressed by the trial court and agreed to by the Defendants. *See infra* ¶22.

"joint representation of co-defendants is not per se violative of the Sixth Amendment right to effective assistance of counsel." *Stringer v. State*, 485 So. 2d 274, 275 (Miss. 1986) (citing *Holloway v. Arkansas*, 435 U.S. 475 (1978)). In fact, "[r]epresenting multiple defendants in a criminal case can be accomplished without violating the lawyer's duty to any of his clients, and one attorney can indeed upon occasion meet the needs of all better." *Littlejohn*, 593 So. 2d at 26 (citing *Holloway*, 435 U.S. at 482). "It has been firmly established that a potential for conflict or hypothetical or speculative conflicts will not suffice for reversal." *Stringer*, 485 So. 2d at 275. Rather, "the conflict must be actual." *Id.* (citing *United States v. Alvarez*, 580 F.2d 1251 (¶7) (5th Cir. 1978)). Courts in Mississippi have applied the Fifth Circuit's definition of an actual conflict:

> If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

*Witt v. State*, 781 So. 2d 135, 137 (Miss. Ct. App. 2000) (quoting *Irving v. Hargett*, 518 F. Supp. 1127, 1144 (N.D. Miss. 1981)). Thus, courts are not required to consider "speculative possibilities of conflicts in attempts to plea bargain or use other possible defenses that were not raised at trial." *Stringer*, 485 So. 2d at 275.

¶21. Here, Magee and Haynes ask this Court to consider "speculative possibilities" surrounding their ability to testify and their plea-bargaining process. First, there is no evidence in the record that either Magee or Haynes planned to testify. Second, there is no evidence in the record that the State offered a plea deal to either Defendant. As for Magee's

10

theory of defense, Magee did not assert duress as a defense at trial. In accordance with our State and federal precedent, this Court finds that Magee and Haynes failed to establish any actual conflict of interest or resulting prejudice as a result of the joint representation.

¶22. For the sake of argument, even if Magee and Haynes had shown an actual conflict, they waived that conflict in written and oral form. Before trial, the court provided each of the Defendants with a form entitled "Waiver of Conflict of Interest." The document informed each defendant of his constitutional right to effective assistance of counsel. The court required the attorneys to discuss the potential conflicts with their clients and explain the "waiver in detail." The form also listed examples of conflicts of interests that "can be dangerous to a Defendant in a number of ways":

> The government may offer to recommend a lesser sentence to one Defendant if he cooperates with the government. His lawyer ought to advise him on whether or not to accept this offer. But if the lawyer advises him to accept the offer, it may harm the cases of the other defendants, who are also his clients.

> The government may let a defendant who is not as involved as other defendants plead guilty to lesser charges than the other defendants. After the guilty plea, however, the government may require the defendant to testify. The lawyer who represents more than one defendant might recommend that the first defendant not plead guilty to protect the other defendants that he represents; or the Lawyer might recommend that the first defendant plead guilty, which might harm the cases of the other defendants.

> Sometimes one of the defendants represented by a lawyer will take the stand to testify in his own behalf. In order to represent the other defendants fairly, the lawyer should question the defendant on the stand as completely as possible. However, he may not be able to do that because he cannot ask the defendant as a witness about anything that defendant has told him in confidence.

> The best defense for a single defendant often is the argument that while the other defendants may be guilty, he is not. A lawyer representing two or more

11

defendants cannot effectively make such an argument.

> The court urges each defendant to obtain a lawyer who will represent him and only him. Each defendant has the right to a lawyer of his own. Each defendant can also give up that right if he so chooses.

Each defendant signed the form. In doing so, each Defendant acknowledged that he "ha[d] read the above statement/notice of [his] rights and [understood] it fully." Each Defendant also expressly waived his right to his own attorney. Additionally, both attorneys signed the waiver-of-conflict form. Further, the circuit court discussed the form with both Defendants, during which the following exchange occurred:

| The Court: | Now, I see you have signed this waiver of possible conflict of interest. And the United States Constitution and Mississippi Constitution give every defendant the right to effective assistance of counsel. When one lawyer represents two or more defendants in a case the lawyer may have trouble representing all the defendants with the same fairness. This could be a conflict or is a conflict of interest that denies the defendant the right to effective assistance of counsel. Such conflicts are always a potential problem because different defendants may have different degrees of involvement. Each defendant has the right to a lawyer who represents him or her and only him or her . . . it's my understanding that both of you have given up that right and both of you are confident in these two gentlemen as your lawyers now representing you both at the same time. Is that correct? |
|---|---|
| Haynes: | That is correct. |
| Magee: | Yes, sir |
| The Court: | And it's also my understanding that you executed this affidavit and waiver of any possible conflict of interest; is that correct? |
| Haynes: | Yes, sir. |
| Magee: | Yes, sir. |

12

The Court:    I thank you.  And I just need to make certain . . . . I'm required to advise you of that on the record . . . In the course of trial . . . there may arise an issue about testifying.   Each of you has an absolute right to testify if you wish . . . . If you get in a conflict with your attorneys over whether or not to testify, then you should thoroughly discuss that with them.  And then, after that, advise the court as to what your final decision is.  Do you understand that?

Haynes:    Yes, sir.

Magee:    Yes, sir.

On appeal, Haynes admits that the circuit court did a "thorough job of addressing the areas where a conflict could adversely affect each of them."  In reviewing the record, it is evident that Magee and Haynes "knowingly and intelligently waived  [their] constitutional right to conflict-free representation.'" *See Kiker*, 55 So. 3d at 1066 (¶16).  Magee and Haynes requested representation by the same attorneys.  Not only did they sign written conflict waivers, they also acknowledged on the record that they were aware there may be conflicts, but they still wanted to have the same attorneys.

¶23.    In *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), the United States Supreme Court held that the deprivation of a defendant's right to counsel, or the denial of a choice of an attorney without good cause, should result in the reversal of the defendant's conviction.[8] "The Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*,

---

[8] A court may, however, deny a defendant's choice of an attorney in certain situations, such as if the court concludes that the attorney has a significant conflict of interest. *Wheat v. United States*, 486 U.S. 153, 162 (1988).

13

491 U.S. 617, 624-25 (1989); *see also Wheat*, 486 U.S. at 159 ("We have previously held that an element of [the Sixth Amendment] right is the right of a defendant who does not require appointed counsel to choose who will represent him.").

¶24. In this case, the Defendants requested that they be allowed to have the same two attorneys represent them both. After thoroughly addressing the constitutional implications, in both written and oral form, the trial court allowed the Defendants exactly what they said they understood and requested. Now, they complain that the trial court gave them what they asked for after going over the potential conflicts in written form and in open court. It is critically important that trial courts address potential conflicts and balance a defendant's right to choose his attorney in considering those potential conflicts. The trial court here did everything possible to ensure the Defendants knowingly and intelligently waived the potential conflict with their representation by the same attorneys. After review, we find that both Defendants "knowingly" and "intelligently" waived their constitutional right to conflict free representation. *See Kiker*, 55 So. 3d at 1066 (¶16). Accordingly, we affirm as to this issue.

## II. Sufficiency and Weight of the Evidence

¶25. Both Defendants argue that the State presented insufficient evidence to support their convictions for kidnapping and conspiracy and that those verdicts were against the overwhelming weight of the evidence. Additionally, Haynes argues the State presented insufficient evidence to support his conviction of sexual battery and that the verdict was against the overwhelming weight of the evidence. We address each of their arguments in

14

turn below.

¶26. Sufficiency-of-the-evidence claims are reviewed de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). When reviewing a challenge to the sufficiency of the evidence, "[t]he relevant question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). The evidence is viewed in the light most favorable to the State, and the State is given all favorable inferences that can be reasonably drawn from the evidence presented at trial. *Henley v. State*, 136 So. 3d 413, 416 (¶8) (Miss. 2014). "This Court will reverse and render only when the facts point so overwhelmingly in favor of the defendant that reasonable men could not have found, beyond a reasonable doubt, the defendant was guilty." *Jones v. State*, 991 So. 2d 629, 634 (¶11) (Miss. Ct. App. 2008).

¶27. "A motion for new trial falls within a lower standard of review than does that of a judgment notwithstanding the verdict or a directed verdict. A motion for a new trial simply challenges the weight of the evidence." *Lacey v. State*, 310 So. 3d 1206, 1215 (¶22) (Miss. Ct. App. 2020) (quoting *Daniels v. State*, 107 So. 3d 961, 963 (¶12) (Miss. 2013)). Our role as an appellate court is to "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). When reviewing a challenge to the weight of the evidence, this Court must determine whether the trial court abused its discretion by not ordering a new

trial. *Daniels*, 107 So. 3d at 963 (¶12).

### A.    Kidnapping

¶28.    The Defendants were charged with "feloniously, willfully, and without lawful authority and with or without intent to secretly confine, forcibly seize and confine [T.R.], with or without intent to cause the said [T.R.] to be confined or with intent to cause such person to be confined or imprisoned against his will . . . ." *See* Miss. Code Ann. § 97-3-53 (Rev. 2014).  Notably, the Mississippi Supreme Court has held that being forced to act under gunpoint constitutes a forcible seizure for purposes of kidnapping. *Brewer v. State*, 459 So. 2d 293, 296-97 (Miss. 1984).  "Regarding intent, '[t]he Supreme Court has held that kidnapping is not a specific intent crime. That means that no proof is needed that [the defendant] had the specific intent to kidnap at the time of taking [T.R.].  'It is sufficient that the circumstances resulted in such as manner as to effect a kidnapping as opposed to an actual intent to kidnap, i.e., it is not necessary to establish the mental state of intent by direct evidence.'"  *Moberg v. State*, 303 So. 3d 815, 821 (¶20) (Miss. Ct. App. 2020) (quoting *Myers v. State*, 770 So. 2d 542, 544 (¶7) (Miss. Ct. App. 2000)); *see also Milano v. State*, 790 So. 2d 179, 187 (¶32) (Miss. 2001) ("Kidnaping is not a specific intent crime. Therefore, it is sufficient that the surrounding circumstances resulted in a way to effectively become a kidnaping as opposed to the actual intent to kidnap.").

¶29.    Both Defendants argue that they cannot be found guilty of kidnapping under Mississippi law because they had lawful authority as bail bondsmen to confine T.R.  Both Defendants argue that Mississippi Code Section 99-5-27(2)(a) (Rev. 2015) gave them legal

authority to detain and surrender a person on bail. That section reads as follows:

> A bail agent, at any time, **may surrender** the principal **to any law enforcement** agency or **in open court** in discharge of the bail agent's liability on the principal's bond if the law enforcement agency that was involved in setting the original bond approves of such surrender, to the State of Mississippi and any of its courts and at any time may arrest and transport its principal anywhere or may authorize another to do so . . . .

(Emphasis added). However, the Defendants never surrendered T.R. to the jail or in open court. In fact, T.R. asked to be returned to jail. Even if T.R. could be construed as having been **surrendered** on a bond they had just taken him out of jail on minutes before, the Defendants cannot handcuff him, put him in a trunk of a vehicle, drive him to a remote area, handcuff him to a post, and sexually assault him for not paying an amount owed on a bond. The law can offer little solace justifying the actions of the Defendants alleged in this case for non-payment of the bond's cost.

¶30. Further, the Mississippi Rules of Criminal Procedure clearly contradict the contentions of the Defendants. Mississippi Rule of Criminal Procedure 8.7 states:

> In the event that a Professional Bail Agent, Soliciting Bail Agent, or Insurer has provided a surety bond or other form of bail for a defendant **without first obtaining payment in full for the premium on the bond**, that defendant **may not be surrendered because the defendant**, or anyone assuming financial responsibility for the bond premium on the defendant's behalf, **has failed to make any payment to the surety following release of the defendant.**

(Emphasis added). The comment to Rule 8.7 reads:

> However, if the bail agent nevertheless elects to contract with the principal to **issue bail on the payment of less than the full amount due, any subsequent collection effort is merely a contractual matter which may be resolved in civil court, not in criminal court by means of incarceration for nonpayment**. *See Brooks v. Pennington*, 995 So. 2d 733 (Miss. Ct. App. 2007).

17

(Emphasis added).

¶31.     Testimony revealed that Magee helped bail T.R. out of jail.  Initially, Magee and Haynes agreed to accept baseball cards and an iPhone as payments.  Once that "payment" fell through, T.R. attempted to borrow cash from a friend, but he was unsuccessful.  The Defendants did not obtain payment in full for the premium on the bond.  In accordance with Mississippi Criminal Rule of Procedure 8.7, the Defendants had no legal authority to arrest or surrender T.R. for a failure to make a payment when they agreed to take "less than the full amount due."

¶32.     Additionally, Mississippi Code section Annotated 83-39-27(g) (Supp. 2012) prohibits for a bail bondsman to "**[c]oerce**, suggest, aid and abet, offer promise of favor or **threaten** any person on whose bond he is surety or offers to become surety, to **induce that person to commit any crime**." (Emphasis added).  Yet once T.R. informed Magee and Haynes that he could not provide any payment, they ordered him to go back inside his friend's house to commit the crime of obtaining illegal drugs, namely cocaine.  After T.R. was unsuccessful, Magee handcuffed T.R., and Magee and Haynes placed T.R. in the trunk of Haynes' vehicle and held him against his will.  As evidenced in the bail bondsman statutes, Magee and Haynes had no authority to engage or cause someone to engage in criminal activity for the payment of a bond.  Further, once they knew T.R. could not make a payment for his bond, they should have and easily could have taken him back to the Marion County jail, which, according to the record, is open twenty-four hours a day.  They did not.  Instead, Magee and Haynes held T.R. against his will by handcuffing him and placing him in the trunk of the

vehicle. Then, Haynes held T.R. at gunpoint throughout the evening, threatened him, and sexually assaulted him. Simply put, Magee and Haynes cannot hide behind their "authority" as bail bondsmen to engage in criminal activity and escape culpability. Because Haynes and Magee far exceeded their scope of authority as bail bondsmen and had no lawful authority to kidnap T.R. for nonpayment of the bond, their argument fails.

¶33. As for the sufficiency of the evidence, the State presented substantial evidence to support both Defendants' kidnapping convictions. For example, Investigator John Wayne Tolar testified that he first got involved with the case when he received a call from the hospital where T.R. was located. Investigator Tolar interviewed T.R. at the hospital. T.R. informed Investigator Tolar that Magee and Haynes bailed him out of jail, and, when he could not get money for the bond, Magee and Haynes took him to buy cocaine in lieu of money. T.R. told Investigator Tolar that when he came back to Haynes' vehicle without the drugs, Haynes "got mad and pulled a gun on him," handcuffed him, and put him in the trunk of the vehicle. Those handcuffs were admitted into evidence.[9] Investigator Tolar also testified that during his investigation, a pair of blue underwear was recovered from the UTV at Haynes' residence. Photographs of the blue underwear were admitted into evidence. Investigator Tolar also learned during his investigation that there were other calls to dispatch on the morning of August 23, 2017, reporting a "large fertilizer spreader truck located on the bridge on Highway 42," which is where T.R. stated he broke down during his effort to flee

---

[9] The handcuffs were broken into two pieces, allowing T.R. to escape from the front porch. The handcuffs remained on T.R. until they were recovered by law enforcement at the hospital.

19

the Defendants. After the fertilizer truck broke down, T.R. fled on foot.

¶34. MBI forensic scientist Anna Savrock executed a search warrant on Haynes' vehicle—a black 2017 Chevrolet Impala. During her search, she recovered "a pair of shoes with no laces on the floor of the rear driver's side quadrant" and took a photo of the shoes, which was admitted into evidence.[10] The actual shoes were also admitted into evidence.[11] Savrock testified that the shoes were black and a size 10.5. Savrock also checked the vehicle for fingerprints. Although she did not have enough "detail" to identify the fingerprints, she could ascertain that there "was a lot of touching activity in the rear portion of the vehicle." She took photographs of the trunk, which were admitted into evidence. Finally, Savrock testified that she recovered a chrome revolver from the vehicle, which was identified by T.R. as the one used when he was held against his will.

¶35. Antoinette Griggs, Steward's girlfriend, testified that she received a call from T.R. on the morning of August 23, 2017. She stated that T.R. was looking for his brother. Based on the phone call, Griggs was "concerned." Griggs woke Steward up, and they drove to Bassfield to get T.R. She testified that T.R. was "limping" when they arrived. Griggs eventually drove T.R. to the hospital and waited at the hospital until T.R. was released. During direct examination, the State showed Griggs the handcuffs previously admitted into

---

[10] The record is silent as to how the shoes were placed back into Haynes' vehicle after T.R. was videoed at the utility pole. T.R. testified that at some point afterward, "they took my shoes."

[11] During Savrock's testimony, the shoes were admitted into evidence for identification purposes only. The shoes were later admitted as substantive evidence during T.R.'s testimony.

20

evidence. She testified, "I remember the handcuffs, because I was getting them and I gave them to some officer."

¶36.    Steward testified that when he and Griggs arrived in Bassfield, T.R. was "scared." Steward stated, "[Y]ou could tell he'd be running through some stuff, through some bushes or something . . . he had bruises and stuff . . . [he] tried to sit in the truck [and he did not] want to sit all the way down . . . ."

¶37.    T.R. testified that Magee and Haynes picked him up from jail in a "dark colored Chevy" and that "they were drinking alcohol." He testified that he sat in the rear driver's side of the vehicle, behind Magee. T.R. was wearing a t-shirt, blue jean shorts, blue underwear, and a pair of "Black Jordans," size 10.5, which matched the description of the shoes recovered during the search of Haynes' vehicle. The State showed T.R. the pair of shoes recovered from the vehicle, and he testified those were the shoes he was wearing the night of the incident. The State also showed T.R. a picture of the blue underwear recovered from the UTV, and he testified that the underwear pictured was his underwear from the night of the incident.

¶38.    T.R. testified that when he could not pay Haynes with money or cocaine, he asked Haynes to take him back to jail. At that point, Haynes instructed Magee to pull the vehicle over. Then "Haynes pulled a revolver and [told] me to get out of the car . . . that's when they take me back and put handcuffs on me [behind my back]." T.R. then testified that they put him in the trunk of the vehicle. T.R. described the gun as a chrome revolver similar to the one recovered during the search of the vehicle. T.R. testified that he was in fear when

Haynes drew his gun. T.R. stated that he was in the trunk roughly twenty to thirty minutes before arriving at Haynes' residence.

¶39. Once they arrived, Magee and Haynes pulled T.R. out of the trunk, and Haynes was still holding his chrome revolver. T.R. testified that Magee removed the handcuffs and told him to get inside the vehicle. Magee and Haynes left T.R. in the vehicle and went inside Haynes' residence. When asked if he felt like he "could leave at any point," T.R. responded, "No ma'am. I didn't . . . I didn't know where I was at, by me being held at gunpoint." When Magee and Haynes returned, T.R. "was crying because [he] felt like these guys, they drinking, they drunk . . . and, you know, he done held me at gunpoint."

¶40. Haynes told T.R. to exit the vehicle and walk toward the nearby utility pole. When he reached the pole, Haynes stated, "I'm going to show you what happen when you mess with Allen Ray Haynes." According to T.R., Haynes drew his gun, pointed it at T.R., and told him to "kiss" the pole. Then, Haynes told T.R. to "act like [he was] having sex with the pole." Magee recorded the incident with his phone and Haynes' phone, and those videos were played for the jury. In the videos, T.R. appears to be sweating, upset, and under stress. At some point while T.R. was against the pole, Haynes ordered him to take off his shorts and underwear, which later would match the underwear taken from the UTV. In one of the videos, T.R. is seen wearing the black shoes admitted into evidence.

¶41. T.R. testified that after Haynes said his bond was "paid in full," he asked Haynes to take him to his friend Sims' house in Bassfield. Magee and Haynes refused and instead took him nearby to a log cabin and handcuffed him to post on the front porch, and Haynes said he

22

was going to come back and set him on fire. T.R. testified that Haynes actually threw diesel fuel on his chest. When Magee and Haynes left temporarily, T.R. escaped.

¶42. The defense presented one witness—Chelsea Courvelle. Courvelle testified that she was in a holding cell with Cochran a few months after the incident and that she read a letter T.R. gave Cochran. Courvelle testified that the letter revealed T.R. was going to "over exaggerate" what happened to him the night of the incident by claiming he was "sodomized." She claimed T.R.'s motivation was to "get him out of trouble" with the grand larceny charge. When pressed further, Courvelle alleged the letter stated T.R. hoped to receive money from Magee's and Haynes' convictions. Notably, Jessica Cochran denied telling Courvelle that there was a "plot" to get money from Haynes. She also denied "fabricating" the story of T.R.'s abuse.

¶43. "The jury is the sole judge of the credibility of witnesses, and its decision based on conflicting evidence will not be set aside where there is substantial and believable evidence supporting the verdict." *Jones v. State*, 252 So. 3d 574, 587 (¶54) (Miss. 2018). Further, "the jury . . . is free to accept or reject all or some of the testimony given by each witness." *Young v. State*, 236 So. 3d 49, 57 (¶35) (Miss. 2017). Here, the jury was presented with conflicting testimony: the State's witnesses' testimony and the testimony from the defense's sole witness Chelsea Courvelle. The jury determined the weight and worth of the conflicting testimony and found that Magee and Haynes were both guilty of kidnapping. Viewing the evidence in the light most favorable to the State, we find that there was sufficient evidence presented for a reasonable trier of fact to find that the State proved the essential elements of

23

kidnapping beyond a reasonable doubt.

¶44. Additionally, Magee claims that his guilty verdict for kidnapping was against the overwhelming weight of the evidence and therefore the court erred in denying his motion for a new trial. When determining if a trial court judge abused his or her discretion in denying a motion for a new trial, this Court will not act as the "thirteenth juror." *Little*, 233 So. 3d at 292 (¶20). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id*. at 289 (¶1).

¶45. The jury here had abundant evidence to consider. The victim testified as to the actions of the Defendants and the police collecting evidence corroborating his story. The defense's only witness testified that T.R. and his girlfriend were essentially lying and they had a plan to make up an "exaggerated" story to avoid their grand larceny charges. On cross-examination, Courvelle admitted that she sold Haynes a vehicle a few weeks before trial and that he offered her a job as finance manager for his future car businesses. The jury judged each witness's credibility and ultimately determined that Magee and Haynes were guilty of kidnapping. Accepting the evidence supporting the jury's verdict as true in this case, the verdict was not so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice.

### B. Conspiracy

¶46. Both Defendants also argue that there was insufficient evidence to support their convictions for conspiracy. Magee also argues that his conspiracy conviction was against

24

the overwhelming weight of the evidence. Section 97-1-1(1) defines a conspiracy as when "two (2) or more persons conspire either: (a) [t]o commit a crime" or to engage in some other specified conduct.[12] Miss. Code Ann. § 97-1-1(1) (Rev. 2014). In *Sanderson v. State*, the Mississippi Supreme Court held that "the elements of a conspiracy require 'recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose.'" *Sanderson v. State*, 883 So. 2d 558, 560 (¶8) (Miss. 2004) (quoting *Peoples v. State*, 501 So. 2d 424, 428 (Miss. 1987)). The conspiracy agreement need not be formal or express but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators. Furthermore, the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence." *Franklin v. State*, 676 So. 2d 287, 288 (Miss. 1996). Stated differently, "No magic words, handshakes, winks, nods, spoken agreements, or acknowledgments are necessary. A conspiracy may instead be inferred from the circumstances, declarations, acts, and conduct of the alleged conspirators." *Henderson*, 323 So. 3d at 1024 (¶16).

¶47. Haynes argues that because Count IV (conspiracy) of the indictment used the conjunctive term "and," and since he was not found guilty on all three charges listed in the indictment, his conspiracy conviction should be reversed.[13] Count IV (conspiracy) of the

---

[12] Notably, the Mississippi Supreme Court recently has recognized that a defendant can be guilty of "unilateral conspiracy." *Henderson v. State*, 323 So. 3d 1020, 1024 (¶16) (Miss. 2021); *see* Miss. Code Ann. § 97-1-1(2). In other words, "[i]t is now a statutory felony offense if a person 'voluntarily and willfully' enters into a criminal conspiracy with a law-enforcement officer or informant and that person was not entrapped." *Id*. (citing Miss. Code Ann. § 97-1-1(2)).

[13] Magee and Haynes were found not guilty of the attempted murder charge.

25

indictment read:

> Allen Ray Haynes and Kurt Mishael Magee in Jefferson Davis County, Mississippi, on or about August 22, 2017, did willfully, unlawfully, feloniously conspire, combine and confederate with one another to commit crimes against [T.R.], to-wit: **Sexual Battery, Kidnapping, and Attempted Murder**; contrary to and in violation of Section 97-1-1 of the Mississippi Code of 1972, as amended; against the peace and dignity of the State of Mississippi.

(Emphasis added).

¶48. "The crime of conspiracy does not become merged in [the] crime committed pursuant thereto." *State v. Thomas*, 645 So. 2d 931, 933 (Miss. 1994) (quoting *Norman v. State*, 381 So. 2d 1024, 1028 (Miss. 1980)); *see also Martin v. State*, 197 Miss. 96, 19 So. 2d 488, 489 (1944). Rather, "[a] conspiracy is a separate, complete offense and the crime is completed once the agreement is formed; no further overt act is required to be shown." *Thomas*, 645 So. 2d at 933. "Conspiracy to commit a crime is different from the crime that is the object of the conspiracy, the first necessarily involves joint action while the other does not." *Id.* (citing *Moore v. State*, 290 So. 2d 603 (Miss. 1974)).

¶49. Although no case is directly on point as to the argument addressed here, the analysis set forth in *Smith v. State*, 250 So. 3d 421 (Miss. 2018), is instructive. There, the Mississippi Supreme Court addressed whether the State increased its burden of proving the offense of armed robbery by listing specific items taken during the robbery in the indictment. Specifically, the indictment read in relevant part:

> Rickie Omar Smith . . . did wilfully, unlawfully and feloniously take, steal and carry away from the presence of the said Jessica Joe-Cobblah, against her will, certain personal property of value of the said Jessica Joe-Cobblah, to-wit: **a playstation, wallet, purse and approximately four hundred dollars in**

26

**United States currency** . . . .

*Id*. at 425 (¶15) (emphasis added). On appeal, Smith argued the State increased its burden by adding "surplus language" in the indictment and that the evidence was insufficient to show he took all four items from the victim. *Id*. at 426 (¶17). The supreme court rejected Smith's argument and held that "a failure of proof as to some of the items listed in the indictment does not entitle Smith to a judgment of acquittal." *Id*. at 428 (¶28). The supreme court reasoned that "the jury clearly found at trial that the State's proof showed that **personal property** was taken from Jessica's house during the robbery, including any one or more of the following: $400 cash, a PlayStation, and a red designer belt." *Id*. (emphasis added).

¶50. Notably, this Court analyzed a similar issue in *Azomani v. State*, 222 So. 3d 343, 350-51 (¶20) (Miss. Ct. App. 2016), where the defendant, Dr. Azomani, was found guilty of two counts of Medicaid fraud. The indictment "accused Dr. Azomani of making 'false, fictitious[,] **and** fraudulent claims for Medicaid benefits.'" The jury instructions stated Dr. Azomani could be found guilty "if he presented "false, fictitious[,] **or** fraudulent claims for Medicaid benefits. . . ." *Id*. at (¶18). Although this Court found his argument procedurally barred on appeal, we reiterated "that when two or more of the alternatives . . . are alleged in the indictment in the conjunctive, the accused may be found guilty if the proof established all or either of the alternatives." *Id*. at (¶20) (quoting *Lenoir v. State*, 237 Miss. 620, 625, 115 So. 2d 731, 733 (1959)). This Court further recognized the "general rule that where a statute denounces as an offense two or more distinctive acts, things, or transactions enumerated therein in the disjunctive, the whole may be charged conjunctively and the

defendant found guilty of either one." *Id.* (quoting *Booker v. State*, 64 So. 3d 965, 971 (¶19) (Miss. 2011)).

¶51.    In accordance with *Smith*, *Azomani*, *Lenoir*, and *Booker*, this Court finds that the three crimes listed in Count IV of the indictment were additional facts, not essential elements of the crime of conspiracy.  Conspiracy requires the State to prove beyond a reasonable doubt that Magee and Haynes agreed with each other to **commit a crime**.  *See* Miss. Code Ann. § 97-1-1.  Thus, the State was not required to prove beyond a reasonable doubt that the Defendants agreed to commit all three crimes.  Therefore, Haynes' argument is without merit.

¶52.    As to the issue raised by the Defendants regarding the sufficiency of the evidence on their conspiracy convictions, the evidence presented at trial, viewed in the light most favorable to the State, was sufficient for the jury to return guilty verdicts.  The record shows that Magee was the driver of the vehicle in which T.R. was held against his will and placed in the trunk.  Then, Magee handcuffed T.R. before Haynes put T.R. in the trunk of the vehicle.  When all three men arrived at Haynes' residence, Magee removed T.R.'s handcuffs and placed him in the backseat of the vehicle.  Magee and Haynes then went into Haynes' residence for an unknown period of time to play pool before returning to the vehicle.  Magee was present when Haynes put a gun to T.R.'s head and forced him to pretend to have sex with a telephone pole.  In fact, Magee recorded the events with his phone and Haynes' cell phone.  Magee then drove the UTV to a nearby log cabin with Haynes in the passenger seat and T.R. in the back.  Magee was present when Haynes poured diesel fuel on T.R. and

28

repeatedly threatened to light T.R. on fire. Magee was also present while Haynes forced a stick into T.R.'s rectum. After review, we find that the evidence was sufficient to support Magee's and Haynes' convictions of conspiracy to "commit a crime." The jury found both Defendants guilty of kidnapping. Kidnapping is a crime under Mississippi law, and, therefore, any implied or express agreement to commit that crime completed the crime of conspiracy.

¶53. Magee also claims that his guilty verdict for conspiracy was against the overwhelming weight of the evidence and that therefore the court erred in denying his motion for a new trial. Accepting the evidence supporting the jury's verdict as true in this case, we find that the verdict is not so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice.

### C.    Sexual Battery

¶54. Haynes argues that the evidence is insufficient to support his conviction of sexual battery and that the verdict was against the overwhelming weight of the evidence.[14] Mississippi Code Annotated section 97-3-95(1)(a) (Rev. 2014) states that "[a] person is guilty of sexual battery if he or she engages in sexual penetration with . . . [a]nother person without his or her consent." "'Sexual penetration' includes . . . any penetration of the genital or anal openings of another person's body by any part of a person's body, and insertion of **any object** into the genital or anal openings of another person's body." Miss. Code Ann. § 97-3-97 (Rev. 2014) (emphasis added).

---

[14] Magee was found not guilty of the sexual battery charge.

¶55. Dr. Emily Nix treated T.R. at the hospital and testified at trial. She testified that when T.R. arrived, he "was in rectal pain as foreign objects had been inserted in his rectum." She also testified that his blood pressure and heart rate were higher than normal. During her exam of T.R., she noticed he had several shards of sticks and bark protruding from his rectum. She testified that she was able to pull the sticks out of his rectum and that there was no evidence his intestines had been perforated. T.R.'s testimony was consistent with Dr. Nix's testimony. Specifically, he testified that Haynes told him to "bend over" and then Haynes started "forcing sticks inside of him."

¶56. Viewing the evidence in the light most favorable to the State, we find the State presented sufficient evidence to support Haynes' conviction of sexual battery. Further, in accepting the evidence supporting the jury's verdict as true in this case, the verdict was not so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would sanction an unconscionable injustice. Accordingly, we find Haynes' argument is without merit.

### III. Jury Instructions

¶57. Both Defendants claim the court committed reversible error in refusing proposed Jury Instructions D-8 and D-9. "[T]he standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). The instructions must be read as a whole, and "if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶176) (Miss. 2006)).

¶58.   Proposed Jury Instruction D-8 read:

ALLEN RAY HAYNES AS BAIL AGENT FOR [T.R.] WAS LEGALLY AUTHORIZED TO ARREST [T.R.] ANYWHERE OR AUTHORIZE KURT MISHAEL MAGEE TO DO SO.

WHEN BAIL IS GIVEN, [T.R.] IS REGARDED AS DELIVERED TO THE CUSTODY OF HIS SURETY, ALLEN RAY HAYNES, WHOSE DOMINION IS A CONTINUANCE OF THE ORIGINAL IMPRISONMENT OF [T.R.].

**WHENEVER HE CHOSE TO DO SO, ALLEN RAY HAYNES WAS LEGALLY AUTHORIZED TO SEIZE [T.R.] OR AUTHORIZE KURT MISHAEL MAGEE TO SEIZE [T.R.] AND DELIVER [T.R.] UP IN THEIR DISCHARGE**; AND IF THAT COULD NOT BE DONE AT ONCE, THEY WERE LEGALLY AUTHORIZED TO IMPRISON [T.R.] UNTIL IT COULD BE DONE.

ALLEN RAY HAYNES WAS LEGALLY AUTHORIZED TO EXERCISE THIS RIGHT IN PERSON OR BY AN AGENT SUCH AS KURT MISHAEL MAGEE.

**IT IS SIMILAR TO THE REARREST BY THE SHERIFF OF AN ESCAPING PRISONER.**

IT IS NOT NECESSARY TO THE OPERATION OF THIS RULE THAT [T.R.] SHALL HAVE ACTUALLY BEEN IMPRISONED. AND THEN BAILED OUT.  IT IS SUFFICIENT IF ALLEN RAY HAYNES BY THE BOND HE PROVIDED FOR [T.R.], KEPT [T.R.] FROM GOING TO JAIL.

(Emphasis added).

¶59.   Proposed Jury Instruction D-9 read:

A BAIL AGENT (ALLEN RAY HAYNES), AT ANY TIME, MAY ARREST ITS PRINCIPAL ([T.R.]) ANYWHERE. OR AUTHORIZE ANOTHER (KURT MISHAEL MAGEE) TO DO SO FOR THE PURPOSE OF SURRENDER OF THE PRINCIPAL ([T.R.]) ON THE BAIL BOND.

¶60.   The trial court denied the Defendants' request to give these instructions to the jury.

Since these proffered instructions do not accurately reflect the law, we find no abuse of

discretion by the trial court. As previously discussed, Magee and Haynes did not have the legal authority to arrest or surrender T.R. for the only reason of nonpayment of the full amount he owed on the bond. *See supra* ¶¶29-32. The remedy for nonpayment of the bond if no payment schedule is agreed to is to petition the circuit court to be released from the bond or to surrender the prisoner back to the jail. *See* MRCrP 8.7. The law does not, nor has it ever, authorized a bondsman to coerce a prisoner to violate the law for bond payment. Nor does the law authorize a bondsman to point a gun, handcuff a prisoner, put that prisoner in the trunk of a vehicle, drive that prisoner to a remote location, and continue to hold him there against his will while he is sexually assaulted, splashed with diesel fuel, handcuffed to a pole, and threatened to be shot or burned and thrown in a lake. For these reasons, we find no abuse of discretion in the trial court's refusal of proposed Jury Instructions D-8 and D-9.

¶61. Haynes also challenged the court's sua sponte jury instruction regarding conspiracy. During deliberation, the jury sent the following question to the judge:

> If found guilty of conspiracy, is the conspiracy charge only for the crimes that they have been found guilty of?

The court responded with Jury Instruction 22, which read as follows:

> The Court instructs the jury that Conspiracy is a separate, complete offense, and the crime of Conspiracy is completed once the agreement is formed. No further overt act is needed, and the commission of the underlying crime(s) is not an element of Conspiracy.

The court brought the jury back in the room and read Jury Instruction 22 out loud to the jury.

The court read Jury Instruction 22 aloud before the defense had an opportunity to state its

32

objection on the record.[15] For the reasons previously discussed in the Defendants' conspiracy arguments, we find no error in the court's sua sponte instruction. *See supra* ¶¶47-51. Because Jury Instruction 22 fairly announced the law as to conspiracy, we find this issue is without merit.

**CONCLUSION**

¶62.　In conclusion, we find that both Defendants "knowingly" and "intelligently" waived their constitutional right to conflict-free representation. We also find the State presented sufficient evidence to support Magee's convictions for kidnapping and conspiracy and Haynes' convictions of kidnapping, conspiracy, and sexual battery. Further, we find that Magee's and Haynes' convictions were not against the overwhelming weight of the evidence. Finally, we find no abuse of discretion in the court's refusal of Defendants' proposed Jury Instructions D-8 and D-9 or the court's sua sponte giving of Jury Instruction 22. Accordingly, we affirm Magee's convictions and sentences and Haynes' convictions and sentences.

---

[15] Mississippi Rule of Criminal Procedure 23.3 states:

> If the jury, after they retire for deliberation, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court, after affording the parties an opportunity to state their objections or assent, may grant additional written instructions in response to the jury's request.

The record is unclear whether the defense was allowed the opportunity to discuss the matter with the court in the chambers prior to the court reading the instruction to the jury. The record does demonstrate, however, that after the instruction was made to the jury, the defense was then allowed an opportunity to object, and the court overruled the objection. Nevertheless, neither party raised this precise issue on appeal.

¶63.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**